**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-01638-NYW

TAMARA BRYANT,

      Plaintiff,

v.

STATE OF COLORADO, DEPARTMENT OF TRANSPORTATION,
JOHN WILLIAM REAMS,
EARL BYRON REAMS, II, and
THE H. NEIL REAMS FAMILY LLLP, a Colorado limited liability limited partnership,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This civil action is before the court on Defendant State of Colorado, Department of Transportation's Motion for Summary Judgment. [#66, filed May 25, 2017]. Also before the court is Defendants John William Reams, Earl Byron Reams II, and The H. Neil Reams Family LLLP's Motion for Summary Judgment. [#69, filed May 31, 2017]. The Motions are before the undersigned pursuant to 28 U.S.C. § 636(c) and the Order Referring Case dated August 19, 2016, [#39]. The court has carefully considered the Motions and associated briefing, the entire case file, and the applicable law. For the reasons stated below, Defendant State of Colorado, Department of Transportation's Motion for Summary Judgment is **DENIED**, and the Reams Defendants' Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.

# BACKGROUND

On December 21, 2015, Plaintiff Tamara Bryant ("Plaintiff" or "Ms. Bryant") was a passenger in a vehicle travelling westbound on Colorado State Highway 145 in or around the Nucla/Naturita community. At approximately 7:00 p.m., the vehicle in which Plaintiff was riding struck a cow that another motorist had previously hit and immobilized. [#28 at ¶¶ 13-17]. The cow was owned by John William Reams, Earl Brown Reams, II, and/or the H. Neil Reams Family LLLP (collectively, the "Reams Defendants"). [*Id.* at ¶ 15]. The collision caused the vehicle to flip onto its passenger side and skid along the pavement at a high velocity, during which Plaintiff's right arm "was pulled out of the passenger window and ground down to a stump as a result of road friction." [*Id.* at ¶¶ 18-19]. Plaintiff sustained multiple injuries in addition to losing her right arm, and seeks damages including but not limited to present and future hospital and medical expenses, past and future lost wages, and loss of enjoyment of life. [*Id.* at ¶ 20].

Plaintiff initiated this personal injury action on June 24, 2016 by filing a Complaint that asserted four common law claims against Defendants the State of Colorado, Department of Transportation ("CDOT"), John William Reams ("John Reams"), Earl Brown Reams, II ("Earl Reams"), and the H. Neil Reams Family LLLP (the "Partnership"). [#1]. On August 1, 2016, Plaintiff filed an Amended Complaint asserting claims for premises liability pursuant to Colo. Rev. Stat. § 13-21-115 and for negligence as to CDOT, [#28 at 1-6], and for negligence and civil conspiracy as to the Reams Defendants.[1] [*Id.* at 6-8]. On October 7 and October 10, 2016, CDOT and the Reams Defendants respectively designated as a non-party at fault Kirk Powell,

---

[1] Plaintiff also named as defendants Trace Campbell and Wendy Campbell, but subsequently dismissed these individuals pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). *See* [#34].

the driver of the vehicle in which Plaintiff was riding at the time of the accident. [#43; #44]. On February 27, 2017, the court granted the motion to amend, *see* [#55]. On March 3, 2017, Plaintiff submitted the Second Amended Complaint, the operative complaint, [#56], and CDOT and the Reams Defendants filed Answers on March 16, 2017, [#57], and March 17, 2017, [#58], respectively.

The Parties thereafter sought, and the court granted, extensions of certain deadlines to allow the Parties to complete their pretrial preparations. *See* [#59 through #63]. On May 25, 2017, CDOT filed its pending Motion for Summary Judgment, arguing that there is no evidence to support finding that the subject cow wandered through a CDOT fence, and there is no evidence that CDOT was provided with actual notice of a defect in a CDOT fence line through which the subject cow ultimately escaped. [#66]. The Reams Defendants, following the request and grant of a second short extension, filed their Motion for Summary Judgment on May 31, 2017 [#69]. Plaintiff subsequently moved for an extension of time to respond to CDOT's Motion for Summary Judgment, [#71], and then filed a motion to stay the briefing with regard to that Motion, pursuant to Fed. R. Civ. P. 56(d), asking the court for leave to take a second deposition of Defendant Earl Reams.[2] [#73]. On June 21, 2017, Plaintiff filed her Response in opposition to the Reams Defendants' Motion for Summary Judgment. [#75]. The following day, the court held a Status Conference on Plaintiff's request to stay the briefing of the CDOT Motion for Summary Judgment, which request the Reams Defendants opposed to the extent Plaintiff would engage in a second deposition of Earl Reams. *See* [#76]. The court vacated the Final Pretrial Conference set for July 12, 2017 and stayed the deadline for Plaintiff's response to

---

[2] Earl Reams had previously been deposed under Federal Rule of Civil Procedure 30(b)(6) as the corporate designee of the Partnership.

CDOT's Motion for Summary Judgment, pending the court's ruling on the motion to stay. [*Id.*] On July 5, 2017, the Reams Defendants filed a Reply in support of their Motion for Summary Judgment. [#77]. The Reams Defendants filed a response to Plaintiff's motion to stay the briefing of the CDOT Motion for Summary Judgment on July 11, 2017, [#78], and Plaintiff filed a reply on July 18, 2017, [#79]. The following day, the court granted Plaintiff's motion to stay in part and denied it in part and reopened discovery solely to allow Plaintiff to take a limited deposition of Earl Reams, in his individual capacity. *See* [#80]. Plaintiff subsequently filed a Response to the CDOT Motion for Summary Judgment on August 18, 2017, [#81], and CDOT filed a Reply on August 31, 2017 [#82]. The motions are now ripe for disposition, and the court held a Final Pretrial Conference on December 14, 2017.

## LEGAL STANDARD

Defendants are entitled to summary judgment only if they show "that there is no genuine dispute as to any material fact, and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987). "Where the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

Defendants are the moving parties and thus they bear the burden of showing that no genuine issue of material fact exists. *Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). More specifically, because Defendants do not have the burden of proof at trial, their Motions for Summary Judgment must point to an absence of sufficient evidence to establish the claims that Plaintiff is obligated to prove. If Plaintiff comes forward with sufficient competent evidence to establish a *prima facie* claim, a trial is required. *Heineman v. American Home Products Corporation*, 67 F. Supp. 3d 1189, 1192 (D. Colo. 2014) (citing *Celotex Corp.*, 477 U.S. at 322-23). In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The court derives the following facts from those to which Plaintiff and CDOT stipulate and from the deposition transcripts submitted by the Parties in support of their briefs. The Reams Defendants did not include a statement of undisputed material facts in their Motion, nor do they contest the statement of facts that Plaintiff presents in her Response. Accordingly, the court considers the following facts as undisputed for the purpose of reviewing both Motions for Summary Judgment.

<u>The Accident</u>

On December 21, 2015, at approximately 7:00 p.m., a jeep driving southbound on Colorado Highway 145 south of Naturita, Colorado, struck a cow approximately 191 feet east of the junction of Highway 141 and Highway 145 in Montrose County, Colorado. [#66 at 3, ¶ 1]. The Partnership owned the cow. [*Id.* at ¶ 3]. Trooper Mark Hanson of the Colorado State Patrol investigated the accident. [*Id.* at ¶ 2]. The force of the collision disabled the jeep and threw the cow into the northbound lane of traffic of Highway 145, where it was struck by a Toyota pickup truck driven by Mr. Powell and in which Plaintiff was a passenger. [*Id.* at ¶¶ 4, 5]. Plaintiff's right arm was amputated as a result of the injuries she sustained during the collision. [*Id.* at 4, ¶ 6].

Johnathon White resides at 30737 Highway 145, Redvale, Colorado. [#66 at 4, ¶¶ 7, 8]. The collision between the jeep and the cow occurred on Highway 145 approximately 100 yards south of Mr. White's residence. [*Id.* at ¶ 9]. When Mr. White heard the sound of the collision, he immediately left his residence for the scene of the accident. [*Id.* at ¶ 10]. Mr. White was thus present when Mr. Powell's Toyota pickup truck collided with the immobilized cow in the northbound lane of Highway 145. [*Id.* at ¶ 11].

<u>Parcel 079</u>

For years, the Partnership has grazed cattle on a property identified as Parcel No. 4269-214-00-079 ("Parcel 079"), which is located in the vicinity of the Highway 141 and Highway 145 junction. [#66 at 5, ¶ 12]. The property is identified as Parcel 079, but is also known as the Naturita Creek or Naturita Creek Ranch parcel. [*Id.* at ¶¶ 12, 13]. Parcel 079 comprises 480 acres and the Partnership's cattle graze on the entire parcel. [*Id.* at ¶ 14]. In December 2015,

approximately 40 cows belonging to the Partnership grazed on Parcel 079. [*Id.* at ¶ 15]. The Partnership intended for the cow involved in the accident to be grazing on Parcel 079. [*Id.* at ¶ 16].

Parcel 079 is fenced, with the exception of a stretch of the northeast perimeter.[3] *See* [#66-6]. Earl Reams testified as the Partnership's corporate designee that this stretch is not a natural boundary, "[b]ecause the cows climb right through it." [#75-2 at 86:13-21]. He further testified that "probably the State does not want to fence it. It's rough. It's rough country, but it's…not good…for a natural boundary." [*Id.* at 86:23-87:1]. He testified that the Partnership has considered erecting a fence along that stretch of perimeter, but has never commissioned a fence because construction is too expensive. [*Id.* at 87:2-10]. Earl Reams also testified that, with respect to this stretch of the perimeter, "the easy place to fence would be inside the State right-of-way," but that, "per law…that's CDOT's deal, and you can't just go in and do what you want on CDOT property." [*Id.* at 90:16-91:14]. Cows wander through these gaps in the fencing to exit Parcel 079 and enter the highway in the vicinity of Highway 141 and Highway 145. [#66 at ¶ 17].

Earl Reams testified that to his recollection, a CDOT fence runs alongside the northern stretch of the 079 Parcel and parallel to Highway 141. [#81 at 3, ¶ 2]. Steven Kelso, testifying on behalf of CDOT as its Rule 30(b)(6) designee, confirmed that CDOT maintains a fence along the north side of the 079 Parcel, described by Plaintiff's counsel as "kind of towards the western

---

[3] Deposition Exhibit 24 identifies with "Xs" the fence line surrounding Parcel 079. The pink lines indicate CDOT fences, and the blue lines indicate fences maintained by the Partnership. [#66 at ¶ 18]. Deposition Exhibit 24 also identifies stretches of land, designated by circles, where Parcel 079 is not fenced and where cows would exit the Parcel and enter the roadway. [*Id.* at 6, ¶ 19].

end of the 079 Parcel," and described by Mr. Kelso as running from the Naturita Creek Bridge, Mile Marker 59, north. [#66-7 at 26:19-27:6]. Mr. Kelso testified that "CDOT does not maintain any fencing on Highway 141 from the junction north or on the west side of the highway going south." [#66 at 6, ¶ 20]. CDOT maintains fencing on Highway 141 from the Naturita Creek Bridge, which is at mile marker 59 north along Highway 141, through the town of Naturita. [*Id.* at ¶ 21]. Thus, there are portions of the fence line that surrounds Parcel 079 the maintenance for which CDOT bears responsibility. Earl Reams testified that he has seen tracks where cows have left the 079 Parcel, and identified those points of egress as the northeast corner where no fence exists ("from the junction 145/141 west on 141), the northwest corner where CDOT maintains the boundary, and "the far end of the Naturita Creek property…the 078." [#66-1 at 150:22-151:6].

Two to three times per year, cattle owned by the Partnership enter the property owned by Mr. White and his grandfather. [#66 at 6, ¶ 22]. The wandering cattle travel from Partnership property located south of the junction of Highway 141 and Highway 145. [*Id.* at ¶ 23]. On at least one occasion between December 19-21, 2015, before the accident, cattle owned by the Partnership entered the highway in and around the junction of Highway 141 and Highway 145. On that occasion, the Partnership herded the cattle off the highway and onto Parcel 079, which is west of the junction at Highway 141 and Highway 145. [*Id.* at ¶ 24]. During his deposition, Mr. White testified to his opinion that the cow involved in the accident was a member of the group of cows that entered his property between December 19th and 21st of 2015. [*Id.* at ¶ 26]. During his deposition, Earl Reams could think of no reason to doubt Mr. White's testimony that the cow involved in the accident strayed from Parcel 079. [*Id.* at ¶ 27].

Many years prior to the accident, on March 22, 2005, Earl Reams sent CDOT a letter, in which he memorialized a meeting at which he notified CDOT of the need for certain fence repairs. [*Id.* at ¶¶ 3, 4]. On June 6, 2005, Earl Reams sent CDOT a second letter, which referenced concerns raised in the March 2005 letter, specifically the need for fence repairs along Colorado State Highway 141 from Naturita to the junction of Colorado State Highways 141 and 145. [#81-1 at 11:10-21]. The June 2005 letter represented that "[s]ome repairs have been made but still more repair is necessary." [*Id.* at 11:22-24]. On September 9, 2005, Earl Reams sent CDOT a third letter, in which he noted that CDOT had not responded to his June 2005 letter and that the fencing along Parcel 079 remained an outstanding issue. [*Id.* at 4, ¶¶ 9, 10]. On October 3, 2005, Earl Reams sent CDOT a fourth letter, in which he summarized his previous correspondence to CDOT and noted, again, that CDOT had not repaired the fence line as requested. [*Id.* at ¶¶ 11, 12]. Earl Reams opined in this letter that CDOT's failure to address the concerns raised in his prior correspondence constituted "serious safety issues" that "could potentially cost human life." [*Id.* at ¶ 13].[4] During his deposition, Earl Reams testified that he did not recall whether CDOT ever made the repairs requested in the 2005 correspondence. [*Id.* at ¶ 14].

Earl Reams also testified that he asked CDOT in 2015 to repair stretches of fence alongside Parcel 079. [*Id.* at 5, ¶ 15]. When asked whether CDOT made the requested repairs, Earl Reams testified that he "didn't think they did a good job." [*Id.* at ¶ 16]. With reference to Colorado State Highway 141, he elaborated that Parcel 079 runs from Mile Marker 59.5 in

---

[4] As CDOT notes in its Reply, it is unclear which conditions Earl Reams believed constituted serious safety issues, as his correspondence to CDOT raised a variety of concerns that included in part the need for fence repairs. *See* [#81-5].

Naturita to the junction of Highways 141 and 145 (just past Mile Marker 57), and that the CDOT fencing near Mile Marker 583 was in "a pretty bad state of repair."

Testimony of Non Parties

The following facts are identified by CDOT as undisputed, they are supported in the record, and Plaintiff does not contest the designation, and thus the court considers them undisputed. *See* Fed. R. Civ. P. 56(e)(2). Trace Campbell is a rancher who uses a seasonal lease, from January through April, to graze cattle on a parcel of land, referred to here as the Naturita Canyon parcel, located in the vicinity of the Highway 141 and Highway 145 junction. [#66 at 7, ¶¶ 28, 29, 30]. CDOT maintains fencing east of the Highway 141 and Highway 145 junction, on the south side of Highway 145. [*Id.* at 8, ¶ 31; #66-10]. This fence line contains a gate ("Gate 1"). [*Id.* at ¶ 32; #66-10]. In November 2015, Mr. Campbell checked the fence line in the Naturita Canyon parcel in advance of moving his cattle onto the land, and found "[n]othing that needed to be addressed right away." [*Id.* at ¶¶ 33, 34; #66-8 at 48:13-17]. Mr. Campbell testified that "[Gate 1] was shut, so cattle could not come back and forth, but there was a broken gate stay." [#66-8 at 49:14-19]. Mr. Campbell did not report the broken gate stay to CDOT. [*Id.* at 49:20-21].

Josh Sinks is a brand inspector for the state of Colorado who lives in the area of the Highway 141 and Highway 145 junction. [#66 at 9, ¶ 39]. Three or four years before Plaintiff's accident, Mr. Sinks spoke to a CDOT employee working east of mile marker 114 and east of where Plaintiff's accident occurred. The employee commented that some of the fence posts where he was working were rotted and could not take a staple. [*Id.* at ¶ 40]. On December 22, 2015, the day after the accident, Mr. Sinks observed that Gate 1 was open and had a broken post.

[*Id.* at ¶ 41; #66-11].  Mr. Sinks opined during his deposition that the subject cow accessed the highway through Gate 1; however, when he observed the gate on December 22, 2015, he saw no evidence that cows had passed through it.  [*Id.* at ¶¶ 43, 45; #66-12 at 39:8-11, 41:17-43:7, 118:11-23, 123:14-25].

In sum, the following material facts are undisputed: the cow belonged to the Reams; the cow wandered from Parcel 079; both CDOT and the Partnership bear responsibility for specific stretches of fencing that surround Parcel 079; there exists a section of the perimeter of Parcel 079 for which no fencing exists; and no one is able to identify the precise location at which the cow exited Parcel 079.

## ANALYSIS

Plaintiff asserts claims for negligence and for exemplary damages under Colo. Rev. Stat. § 13-21-102 as to the Reams Defendants, [#56 at 6-10], and a claim under the Premises Liability Act as to CDOT, [#56 at 4-6].[5]  Plaintiff contends that CDOT was responsible for maintaining right of way fencing on Parcel 079 and along Colorado State Highways 141 and 145, and CDOT's failure to adequately do so resulted in a fence line so deteriorated that it was no longer effective at preventing cattle from wandering out onto Colorado State Highways 141 and 145. [#56 at ¶¶ 21-23].  Plaintiff additionally contends that the Reams Defendants were negligent "in their ownership, care, and control of any fence that would keep [its cattle] in the pasture."  [*Id.* at ¶ 46].   The court exercises jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332, and

---

[5] Plaintiff maintained a claim for common law negligence against CDOT up until the Final Pretrial Conference, at which time her counsel and counsel for CDOT stipulated that no such claim can lie. The court thus dismissed the negligence claim asserted against CDOT in a separate order.  *See* [#88].

thus applies Colorado law. *See, e.g., Bullock v. Wayne*, 623 F. Supp. 2d 1247, 1252 (D. Colo. 2009) (a federal court exercising diversity jurisdiction applies the law of the forum state).

Both CDOT and the Reams Defendants essentially argue that the record contains a lack of proof, and that the court should enter summary judgment as to them because Plaintiff has failed to carry her burden of proving that any alleged breach of duty by Defendants resulted in Plaintiff's injuries and, in CDOT's case, that CDOT was on actual notice of defective fencing. With the exception of Defendant John Reams, Defendants do not argue a lack of duty. The court addresses the common law negligence claim first, the statutory claim as to CDOT second, and the exemplary damages demand last.

## I.  Negligence

"A cause of action in tort arises out of a violation of a legal duty imposed upon an actor to avoid causing harm to others." *United Blood Servs. v. Quintana*, 827 P.2d 509, 519 (Colo. 1992). To recover on her negligence claim, Plaintiff must establish the existence of a legal duty owed by Defendants, a breach of that duty, causation, and damages. *Id.* "It is only in the clearest of cases that the issue of negligence may properly be disposed of on summary judgment." *Westin Operator, LLC v. Groh*, 347 P.3d 606, 617 (Colo. 2015) (quoting *Brown v. Martin Marietta Corp.*, 690 P.2d 889, 891 (Colo. App. 1984)).

### A.  Duty

#### 1.  Applicable Law

The question of legal duty is a question of law. *Quintana*, 827 P.2d at 519. "The court determines, as a matter of law, the existence and scope of the duty—that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal

protection." *Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313, 317 (Colo. 1980). Generally, a legal duty to use due care arises in response to a foreseeable and unreasonable risk of harm to others. *Lyons v. Nasby,* 770 P.2d 1250, 1254 (Colo. 1989) ("A person has a duty to act or refrain from acting when it is reasonably foreseeable that the failure to act or refrain will create an unreasonable risk of harm to another") *superseded by statute*, § 12–47–801, C.R.S. (2014). "[I]n ordinary negligence cases, an actor is required to conform his or her conduct to a standard of objective behavior measured by what a reasonable person of ordinary prudence would or would not do under the same or similar circumstances." *Quintana*, 827 P.2d at 519 (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 32, at 174 (5th ed. 1984)). The Colorado Supreme Court considers the following factors in determining whether a defendant owes a plaintiff a duty to act to avoid injury: "(1) the risk involved in the defendant's conduct; (2) the foreseeability and likelihood of injury weighed against the social utility of the defendant's conduct; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant." *Groh*, 347 P.3d at 613-14 (citing *HealthONE,* 50 P.3d at 888; *Smith v. City & Cnty. of Denver,* 726 P.2d 1125, 1127 (Colo. 1986)).

The Supreme Court of Colorado also recognizes "a distinction between claims based on a defendant's failure to act (i.e., nonfeasance) and claims based on a defendant's active misconduct (i.e., misfeasance)." *N.M. by and through Lopez v. Trujillo*, 397 P.3d 370, 374 (Colo. 2017) (citing *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo. 1987) ("In determining whether a defendant owes a duty to a particular plaintiff, the law has long recognized a distinction between action and failure to act—'that is to say, between active misconduct working positive injury to

others [misfeasance] and passive inaction or a failure to take steps to protect them from harm [nonfeasance].'") (further citation omitted). As explained in *Trujillo*, "[o]ne reason for this distinction lies in the fact that an actor's misfeasance has created a new risk of harm, whereas by nonfeasance, the actor has simply preserved the status quo." *Id. Accord Smit v. Anderson*, 72 P.3d 369, 372 (Colo. App. 2002). Historically, Colorado recognizes a duty in nonfeasance cases only in situations where the parties are involved in a special relationship, often arising from dependence or mutual dependence, such that "social policy justifies the imposition of a duty to act." *Trujillo*, 397 P.3d at 374 (citing *Whitlock*, 744 P.2d at 58). Only six such relationships are recognized in this state: (1) common carrier/passenger, (2) innkeeper/guest, (3) possessor of land/invited entrant, (4) employer/employee, (5) parent/child, and (6) hospital/patient. *Id. See also Groh*, 347 P.3d at 612-13. Absent one of these special relationships, Colorado courts generally decline to impose a duty of care. *See, e.g., id.*

### 2. Application

The undisputed facts offered by the Parties and identified above focus predominantly on the state of repair of the fencing and the historical grazing practices of the Partnership. The court's review of the record created by the Parties revealed additional undisputed facts material to this claim,[6] which are as follows. The Partnership owned the cow. [#66 at 3, ¶ 3]. Defendants Earl Reams and John Reams, brothers, are general partners of the Partnership, and were general partners at the time of the accident. *See* [#75 at 8, ¶ 14; #75-7; #75-8]. However, Earl Reams controls the day-to-day operations of the Partnership. [#69-6 at 189:14-19]. He controls when cows are moved between pastures, when they are branded, and when they are

---

[6] *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record").

sold, and he is the only paid employee of the Partnership. [#69-4 at 108:17-24; #69-6 at 189:14-16, 194:25-195:17]. John Reams owns a construction company, and he only periodically assists with various tasks relating to the operation of the Partnership. When needed, he helps drive cattle between pastures, including to Parcel 079 for winter grazing, and he helps with castration and branding. [#69-6 at 211:25-212:7; #75:9 at 76:5-22]. He occasionally, on an ad hoc basis, mends fences that are in disrepair, and has mended part of the Parcel 079 fence line. [*Id.* at 212:8-17]. However, he does not inspect the Partnership's fences. [#69-6 at 212:18-20; #75:9 at 166:22-167:9]. He has no "day-to-day oversight of any ranching practices in regards to fixing, repairing, inspecting fences," and he makes no decisions "on ranch operations; i.e., when to move cattle, where to take them," and he could not remember ever making a decision "on any ranching operations." [#69-6 at 194:19-195:12]. John Reams helps his brother with the ranch "one to two times a month," when his brother asks if he "can spare a little time." [*Id.* at 189:20-24, 195:6-9, 211:18-24]. In sum, John Reams believes the case "has nothing to do with me…I am not the owner. I have got a construction company. That is not my cow. That is H. Neil Reams' cow, which Earl's the one that's in charge of it." [#69-6 at 40:19, 41:8-11].

John Reams further testified that he and his brother Earl Reams are close and it is common for them to help each other with their respective livelihoods and they do not offer or accept payment from each other for that assistance. [#69-6 at 186:14-22, 188:22-189:10]. When John Reams left his home in Western Montrose County to attend college, Earl began working with their father on the family's ranch and continued in that line of work. [*Id.* at 186:23-187:15]. John Reams returned home after college and worked in mining, then construction. [*Id.*] He testified that since returning to Western Montrose County in the early 1980s, he has never

operated a ranch and that the family's ranch "couldn't afford two employees, two families." [*Id.*]

When asked why he is a member of the Partnership, John Reams represented that he and his

brother inherited the ranch from their father, who had inherited the ranch from his father, and

that Earl "got the bigger percentage," because he was working the ranch; John received a smaller

percentage simply "because [he] was part of the family." [#195:18-196:1].

John Reams testified that he was aware that "ranch livestock" belonging to other ranches

had been involved in highway accidents, [#75-9 at 165:1-8]; he was aware that cows belonging

to the Partnership had been found on highways and other people's property on numerous

occasions, [#75 at ¶ 17; #75-9 at 165:21-25]; and he acknowledged concern that cows belonging

to the Partnership could cause a vehicular accident "[i]f they end up in and around the highway,"

and that such an accident could "result in serious injury or death." [#75-9 at 166:1-10].

However, when asked by Plaintiff's counsel if he has "done anything to prevent the ranch cattle

from leaving pastures and getting on highways and possibly causing accidents," John Reams

testified that if he sees an open gate, he closes it, and if he sees a cow out of the pasture, he stops

his vehicle and moves her back into the pasture. [#75-9 at 166:1-167:6]. He further testified,

"[w]hen I know about cows out, I either put them in or call Earl so he is aware of it and can take

care of it. If I happen to be right there, yes, I always put them in." [#75-9 at 180:1-10]. And in

response to the question, "[h]ow about preventing them from getting out in the first

place…[w]hy not do something to prevent that," John Reams responded, "[b]ecause I don't

know where they are getting out, so I can't prevent something I don't know." [*Id.* at 180:11-16].

Then, when asked if he looked "to find out where they were getting out," he responded, "[n]o…I

didn't know they were getting out." [*Id.* at 190:17-21].

Earl Reams and the Partnership do not contest duty, and the court finds independently that the record evidence demonstrates that the Partnership and Earl Reams, as the person responsible for the daily operations of the Partnership, were involved in affirmative acts of grazing cattle and maintaining pasture land for the grazing of their cattle, and owed Plaintiff a general duty of care in the operation of these activities. *See Groh*, 347 P.3d at 614, n.5 (noting that foreseeability "is an integral element of duty," and "the touchstone of proximate cause") (citations omitted).

However, John Reams contests duty and I agree that Plaintiff has failed to adequately articulate the basis for any duty as to John Reams individually, although I reach this conclusion for reasons not articulated in the Reams Defendants' Motion. *See* [#69 at 5]. Fed. R. Civ. P. 56(e)(3). Notwithstanding the omission of a statement of material undisputed facts in the Reams Defendants' Motion for Summary Judgment, John Reams asks the court to accept as undisputed that he did not own the cow and "did not own the property from where the subject cow presumably came." [*Id.* at 6]. The court understands this testimony as an assertion that John Reams did not own Parcel 079 at the time of the accident, which appears to be in direct conflict with the undisputed fact that John Reams is a member of the Partnership. Nonetheless, it is clear that John Reams's involvement with the Partnership is limited. Considering the undisputed nature of John Reams's circumscribed activities undertaken on behalf of the Partnership, Plaintiff has failed to adduce sufficient facts to establish that John Reams exercised sufficient control over the ranching operations such that he could have avoided breaching any general duty of care. Indeed, his deposition testimony reflects that he was not even aware cows were climbing out of the canyon where Parcel 079 is not fenced. *See* [#75-9 at 163:15-164:2, 10-17].

Any negligence that could be attributed to John Reams must arise from a theory of nonfeasance, as described above. Because the nature of the alleged negligence sounds in nonfeasance rather than malfeasance, and none of the recognized six special relationships exist between John Reams and Plaintiff, I decline to find a duty for the operation of grazing cattle or the daily operations for the Partnership for John Reams as an individual.[7] Accordingly, I grant the Reams Defendants' Motion for Summary Judgment on this issue.

## B. Causation

Earl Reams and the Partnership contend that insufficient proof exists regarding their involvement in the proximate cause of the accident. *See* [#69]. A defendant is not liable for negligence if his or her act was not a proximate cause of the plaintiff's injury. *Leake v. Cain,* 720 P.2d 152 (Colo.1986). A defendant proximately causes an injury when his or her wrongful conduct is a substantial factor in bringing about the plaintiff's injury. *Ekberg v. Greene,* 196 Colo. 494, 588 P.2d 375 (1978). "Proximate cause has two aspects: causation in fact and legal causation." *Reigel v. SavaSeniorCare L.L.C.,* 292 P.3d 977, 985 (Colo. App. 2011). The arguments raised by Earl Reams and the Partnership concern causation in fact.[8] To establish causation in fact, "a plaintiff must show either that (1) but for the defendant's alleged

---

[7] Plaintiff argues "[i]t would be poor policy to allow John Reams to escape liability for the H. Neil Reams Family LLLP's negligent ranching operations when the facts show that he substantially participated in the negligent ranching operations, knew about the danger that those ranching operations posed, did nothing to effectively mitigate those dangers, and still profited from the whole enterprise." [#75 at 17]. The court finds that this argument is not supported by the record before it. John Reams as a member of the Partnership may face liability, but John Reams as an individual cannot.

[8] "Legal causation refers to 'rules of law limiting the liability of a negligent actor' as a matter of 'policy' that are analytically distinct from 'the fact of causation.'" *Vititoe v. Rocky Mountain Pavement Maintenance, Inc.,* --- P.3d ----, 2015 WL 3777138, at *6 (Colo. App. 2015) (citing *Moore v. W. Forge Corp.,* 192 P.3d 427, 436 (Colo. App. 2007)).

negligence, the claimed injury would not have occurred, or (2) the defendant's alleged negligence was a necessary component of a causal set that would have caused the injury." *Reigel*, 292 P.3d at 987 (citations omitted). *See Graven v. Vail Assocs., Inc.,* 909 P.2d 514, 520 (Colo.1995) ( "Where an injury results from the combined negligence of the defendant and other factors, the injury is attributable to the defendant if the injury would not have occurred in the absence of the defendant's negligence."), *superseded by statute as stated in Fleury v. IntraWest Winter Park Operations Corp.,* --- P.3d ----, 2014 WL 554237 (Colo. App. 2014). Whether proximate cause exists is a question for the jury, and "only in the clearest of cases, where reasonable minds can draw but one inference from the evidence, does the question become one of law to be determined by the court." *Lyons*, 770 P.2d at 1254.

Parcel 079 is located in the vicinity of the Highway 141 and Highway 145 junction. [*Id.* at 5, ¶ 12]. In December 2015, the month of the accident, approximately 40 cows belonging to the Partnership grazed on Parcel 079. [*Id.* at ¶ 15]. Prior to the accident but "during that time period," Earl Reams was alerted to the fact that some of the Partnership's cattle had wandered onto the highway near or at the Highway 141 and Highway 145 junction and he "gathered them off the highway and put them into the Naturita Creek parcel to the west of the junction." [#66-1 at 119:18-120:10]. Earl Reams testified on behalf of the Partnership that the Partnership intended for the cow to be grazing on, i.e., contained within, Parcel 079 at the time of the accident. [*Id.* at ¶ 16]. Portions of the perimeter of Parcel 079 are not fenced. Cows wander through these gaps in the fencing to exit Parcel 079 and enter the highway in the vicinity of Highway 141 and Highway 145. [*Id.* at ¶ 17].

A CDOT fence runs alongside the northern stretch of Parcel 079 and parallel to Highway 141. [#81 at 3, ¶ 2]. CDOT bears the responsibility for maintaining this stretch of fencing. [#66 at 6, ¶ 21; #66-7 at 26:19-27:6]. Earl Reams testified that he has observed cattle tracks indicating the points of egress where cows have exited Parcel 079, and he identified those exits as the northeast corner where both CDOT and the Reams have chosen not to construct fencing ("from the junction 145/141 west on 141"), the northwest corner where CDOT maintains the boundary, and "the far end of the Naturita Creek property…the 078 [parcel]." [#66-1 at 150:22-151:6].

The collision between the jeep and the cow occurred on Highway 145, approximately 100 yards south of Mr. White's residence. [#66 at 4, ¶ 9]. Mr. White had lived on his property for approximately five years at the time of his deposition. [#66-3 at 15:22-23]. The property previously belonged to his grandfather, and Mr. White has lived in Nucla almost his entire life. [*Id.* at 16:7-9, 20-25]. He has seen cattle owned by the Partnership on his and his grandfather's property "at least two to three times a year." [*Id.* at 16:12-19]. On at least one occasion between December 19-21, 2015, before the accident, cattle owned by the Partnership strayed from property owned by the Partnership along Highway 141, entered the junction at Highway 141 and Highway 145, and then traveled onto Mr. White's property. [#66 at 7, ¶ 25]. On that occasion, the Partnership moved the cattle off the highway and onto Parcel 079. [*Id.* at ¶ 24]. During his deposition, Mr. White testified to his opinion that the cow involved in the accident was a member of the group of cows that entered onto his property between December 19 and 21. [*Id.* at ¶ 26]. Mr. White also testified that he has observed cattle owned by the Partnership that "come up Reams Canyon" or out of Naturita Creek and "onto the roads"; the cattle cross over the

Highway 141 and Highway 145 junction and wander back into the canyon for Naturita Creek that is south of Highway 145. [#66-3 at 25:2-26:1]. As for the parcel of land that is between the southern branch of Highway 141 and Highway 145, "heading east away from the junction," Mr. White testified that he thought the cattle migrating up that portion of Naturita Creek "walked through the bottom of the canyon" from the pasture, because he never saw fences or gates surrounding that area. [*Id.* at 26:2-24]. He testified that the cattle, "just mosey on out." [*Id.* at 27:1].

The undisputed facts demonstrate that the cow, property of the Partnership, was grazing on Parcel 079 prior to the accident; Parcel 079 was penetrable at specific locations previously identified by Earl Reams; the points of egress were identified in stretches of fencing maintained by both CDOT and the Partnership, and along a fence-less stretch of the perimeter known to both CDOT and the Reams Defendants; and cattle belonging to the Partnership had recently wandered from Parcel 079 onto the adjacent Highway. Mr. Campbell's testimony that Gate 1 did not appear so compromised the month preceding the accident that a cow could pass through it is an issue of fact, as is Mr. Sink's testimony that the cow that caused the accident wandered through Gate 1. Of consequence here, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell,* 555 F.3d 1097, 1110 (10th Cir.2009). Earl Reams and the Partnership have not carried their burden in this respect. I find that the record contains sufficient evidence regarding proximate causation as to Earl Reams and the Partnership to submit the matter of negligence to the jury, and I **DENY** the Reams Defendants' Motion for Summary Judgment as to this issue.

## II.    The Colorado Fence Law

CDOT similarly argues that Plaintiff cannot prevail on her premises liability claim because of the lack of proof regarding causation, and because CDOT did not have actual notice of the compromised fencing for which it was responsible.  The Eleventh Amendment bars suits against a state by its own citizens, and generally immunizes state defendants from liability for damages.  *See Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995).  The Colorado legislature enacted the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. §§ 24–10–101 to –120 in 1971 to reestablish the doctrine of sovereign immunity for public entities.  The Colorado Supreme Court has held that "the immunity created by the Governmental Immunity Act, being in derogation of the common law, must be strictly construed."  *State v. Moldovan*, 842 P.2d 220, 222 (Colo. 1992) (citations omitted).

The Colorado Fence Law "was enacted in 1877 and modified the common law rule that an owner of a trespassing animal was strictly liable for any harm caused by the animal during the trespass."  *Moldovan*, 842 P.2d at 225.  In *Moldovan* the Colorado Supreme Court authorized a personal injury action against CDOT where a highway right-of-way fence had deteriorated such that a calf entered the highway and collided with a motorcycle.  *Id.*  The court concluded that Mr. Moldovan's claim arose "from a dangerous condition of a public highway that physically interferes with the movement of traffic on the paved portion of the highway, for which sovereign immunity is expressly waived pursuant to section 24–10–106(1)(d) of the Governmental Immunity Act."  *Id.* at 226.[9]  The question of sovereign immunity satisfied, the court then looked

---

[9] Section 24-10-103(1.3) defines "[d]angerous condition" as "either a physical condition of a facility or the use thereof that constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been

to "the nature and extent of the state's duty under the Fence Law" to ask "whether the state's failure to maintain a right-of-way fence adjacent to a state highway, as alleged…, renders the state liable in a private tort action for injuries sustained by a highway user." *Id.* at 225. The court concluded that a reading of the statutory text of the Fence Law, considered within the context of the history and structure of the Fence Law, indicated that:

> the primary purpose of imposing an affirmative duty on the Division of Highways to maintain a right-of-way fence along and adjacent to a highway is to protect highway motorists from the danger of injuries resulting from a collision with trespassing livestock.

*Id.* at 226. In 1994, the Fence Law was amended to add a notice provision. The statute currently provides:

> Except as otherwise provided … it is the duty of the department of transportation to maintain right-of-way fences constructed as of June 1, 1994, by the department at or near the boundary of the department's highway property in agriculturally zoned areas along and adjacent to all federal aid highways where such highways are maintained by the department. The department shall make repairs to such right-of-way fences when necessary only upon actual notice to the department. Neither the department nor the landowner is liable for any damages caused by the failure to adequately construct, maintain, or repair the right-of-way fence unless actual notice is given to the department.

---

known to exist and which condition is proximately caused by the negligent act or omission of the public entity or public employee in constructing or maintaining such facility." For the purposes of subsection 1.3, "a dangerous condition should have been known to exist if it is established that the condition had existed for such a period and was of such a nature that, in the exercise of reasonable care, such condition and its dangerous character should have been discovered." Section 24-10-106 waives immunity for a public entity in an action for injuries resulting from, in relevant part, "[a] dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion, if paved, or on the portion customarily used for travel by motor vehicles, if unpaved, of any public highway, road, street, or sidewalk within the corporate limits of any municipality, or of any highway which is a part of the federal interstate highway system or the federal primary highway system, or of any highway which is a part of the federal secondary highway system, or of any highway which is a part of the state highway system on that portion of such highway, road, street, or sidewalk which was designed and intended for public travel or parking thereon." Colo. Rev. Stat. § 24-10-106(1)(d)(I).

Colo. Rev. Stat. § 35-46-111(1)(a).

No one disputes that the Fence Law operates as a waiver of CDOT's immunity to suit in this action. *See generally* [#66; #82].[10] However, after establishing that a waiver to immunity exists, the plaintiff must still prove her tort claim against the public entity to ultimately prevail, "just as any other plaintiff would against a non-governmental defendant." *See* Colo. Rev. Stat. § 24–10–107 ("[W]here sovereign immunity is not a bar under section 24–10–106, liability of the public entity shall be determined in the same manner as if the public entity were a private person.").

**A. Causation**

CDOT first argues a lack of proof regarding causation. Similar to the reasons stated above with respect to Earl Reams and the Partnership, I find the record contains sufficient evidence regarding proximate causation as to CDOT to submit the matter of negligence to the jury. A CDOT fence runs alongside the northern stretch of Parcel 079 and parallel to Highway 141. [#81 at 3, ¶ 2]. CDOT bears the responsibility for maintaining this fence line. [#66 at 6, ¶ 21; #66-7 at 26:19-27:6]. There is also a section of the perimeter of Parcel 079 that CDOT and the Partnership have chosen not to fence. Earl Reams explained in his deposition that constructing a fence along this section would be expensive, but also that "the easy place to fence would be inside the State right-of-way," and that, "per law…that's CDOT's deal, and you can't just go in and do what you want on CDOT property." [#75-2 at 90:16-91:14]. Earl Reams testified that he has observed cattle tracks indicating the points of egress where cows have exited

---

[10] More specifically, CDOT does not invoke Eleventh Amendment immunity. A court may raise the issue of Eleventh Amendment immunity *sua sponte* but, unlike subject matter jurisdiction, it is not obligated to do so. *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir. 2008).

Parcel 079, and he identified those exits as the northeast corner where both CDOT and the Reams have chosen not to construct fencing ("from the junction 145/141 west on 141"), the northwest corner where CDOT maintains a fence, and "the far end of the Naturita Creek property…the 078 [parcel]." [#66-1 at 150:22-151:6]. John Reams testified that he had witnessed CDOT erect fence line in the area in the 1970s, and had never seen CDOT repair those fences lines until just after the accident. [#69-6 at 215:15-216:6]. In addition, Mr. Sinks testified that three or four years before the accident he had spoken to a CDOT employee who was working east of mile marker 114 and east of where the accident occurred, and who commented that some of the fence posts where he was working were rotted and could not take a staple. [#66 at 9, ¶ 40]. On December 22, 2015, the day after the accident, Mr. Sinks observed that Gate 1, in a CDOT fence line, was open and had a broken post, and opined during his deposition that the subject cow must have accessed the highway through Gate 1. [#66 at ¶¶ 41, 43, 45; #66-11; #66-12 at 39:8-11, 41:17-43:7, 118:11-23, 123:14-25].

As noted with the argument that Earl Reams and the Partnership assert, it is not Plaintiff's burden to prove her claim at this juncture; rather, CDOT must establish that the claim fails for lack of proof. I find that CDOT's argument does not satisfy its burden so much as implicate a question of pro rata liability between it and the remaining Reams Defendants, and perhaps Mr. Powell, which is a matter to be addressed and resolved at trial.[11] I turn now to CDOT's argument regarding the statutory requirement of notice.

---

[11] Section 13-21-111.5 provides that the jury shall return a special verdict "determining the percentage of negligence or fault attributable to each of the parties and any persons not parties to the action of whom notice has been given…to whom some negligence or fault is found and determining the total amount of damages sustained by each claimant." Colo. Rev. Stat. § 13-21-

**B. Notice**

The Parties agree that the term "actual notice" is not defined in the statute. CDOT cites the court to what appears to be the only effort to define the term within the context of Colorado statutory law. [#66 at 16]. In reference to the priority of a mechanic's lien, a division of the Colorado Court of Appeals has stated that:

> '[A]ctual notice' is such notice as is positively proved to have been given to a party directly and personally, or such as the party is presumed to have received personally because the evidence within the party's knowledge was sufficient to put the party upon inquiry.

*Powder Mountain Painting v. Peregrine Joint Venture*, 899 P.2d 279, 281 (Colo. App. 1994). In *Seder v. City of Fort Collins*, 987 P.2d 904 (Colo. App. 1999), another division of the Court of Appeals applied the same definition of actual notice to determine that the plaintiff had created an issue of fact as to whether the city defendant had actual notice of an icy condition that had allegedly caused the plaintiff to fall, reversing the trial court's dismissal based on CGIA immunity and instructing the trial court to permit discovery as to whether the city's immunity was waived. *Id.* at 908-09. *See Martinez v. Weld County School Dist. RE-1*, 60 P.3d 736, 740-41 (Colo. App. 2002) (applying actual notice definition as stated in *Powder Mountain Painting* to affirm ruling that school district defendant had actual notice of a hazardous condition because the place where plaintiff fell was "known to be a problem area, the build-up of ice in that location "was a chronic and continuing problem," the school district "had notice and knowledge of the condition," and "even if the School District did not have knowledge of the accumulation of ice the day that Martinez fell, it knew from prior experience that ice would accumulate at that

---

111.5(2). Both sets of Defendants assert apportionment of fault and damages under this statute as an affirmative defense. *See* [#57 at 7; #58 at 14].

location and would cause that condition"); *Gleneagle Civic Ass'n v. Hardin*, 205 P.3d 462, 468 (Colo. App. 2008) (holding homeowners who received and read email had actual notice of contents of email, citing *Powder Mountain Painting*).

The undisputed facts demonstrate that Earl Reams sent correspondence to CDOT on at least four occasions during 2005, raising concerns regarding the state of the fencing along Colorado State Highway 141 from Naturita to the junction of Colorado State Highways 141 and 145, and the need for repairs. [#66 at 7, ¶¶3, 4, 9-13, 15, 16; #81-1 at 11:10-24]. Earl Reams could not recall during his deposition whether CDOT ever made the repairs requested in the 2005 correspondence. [#66 at 4, ¶ 14]. However, he again asked CDOT in 2015 to repair stretches of fence alongside Parcel 079. [*Id.* at 5, ¶ 15]. When asked whether CDOT made the requested repairs, Earl Reams testified that he "didn't think they did a good job." [*Id.* at ¶ 16]. With reference to Colorado State Highway 141, he elaborated that Parcel 079 runs from Mile Marker 59.5 in Naturita to the junction of Highways 141 and 145 (just past Mile Marker 57), and that the CDOT fencing near Mile Marker 583 was in "a pretty bad state of repair." As mentioned above, John Reams testified that right after the accident, he observed CDOT repairing fence line along the northwestern section of Parcel 079 and repairing fence line and a gate "outside of the property on 145." [#69-6 at 214:15-215:19]. John Reams recalled when CDOT erected certain fence lines in that area in the 1970s, and testified that since the initial construction, he "never saw anyone improve it or build a new one." [*Id.* at 215:15-216:6]. Mr. White testified that he had never walked the CDOT fence line "that runs along the northern side of Highway 145 or the northern side of Highway 141," just west of his property, but that "from the road, it's not in good shape." [#69-3 at 37:15-20]. The record is devoid of documentary or

testimonial evidence that, in response to Earl Reams's letters, CDOT undertook repairs to the fence lines, authorized private landowners to repair the fence lines, or explained why repairs were not necessary. Rather, the record suggests that no repairs were initiated by CDOT from the time the fences were erected.

CDOT argues that in the correspondence referenced above and during his deposition, Earl Reams failed to identify the precise location of the fencing that he believed required repair, and, with respect to his 2015 request, the reason for his dissatisfaction with the repairs. [#82 at 8]. CDOT further argues that the record "does not show…that the cow escaped through the fence after repairs were made." [*Id.*] The court is not persuaded by these arguments, and finds based on the evidence cited above that Plaintiff has carried her burden of demonstrating a *prima facie* claim. The court would note that even at trial, the burden of proof Plaintiff carries is not absolute, or even akin to the burden of proving an element of a claim beyond a reasonable doubt or by clear and convincing evidence. Rather, Plaintiff must show by a preponderance of proof that CDOT's alleged negligence resulted in the accident that caused her injuries. *See* Colo. Rev. Stat. § 13-25-127. Proof "by a preponderance of the evidence" demands that the evidence "preponderate over, or outweigh, evidence to the contrary." *City of Littleton v. Industrial Claim Appeals Office*, 370 P.3d 157, 168-69 (Colo. 2016); CJI-Civ. 3:1 (2017). "[T]he widely accepted formula for expressing this burden of persuasion is 'more probable than not.'" *City of Littleton*, 370 P.3d at 169 (quoting *Mile High Cab, Inc. v. Colo. Pub. Utils. Comm'n,* 302 P.3d 241, 246 (Colo. 2013). The record demonstrates that CDOT's fence lines around the junction of Highway 141 and 145 were in disrepair for many years and that CDOT received notice of such.

Accordingly, the issue of causation cannot be determined at this stage based on the record before the court and CDOT's Motion for Summary Judgment is **DENIED**.

### III.    Exemplary Damages

Finally, Plaintiff asserts a claim for exemplary damages under Colo. Rev. Stat. § 13-21-102 as to Earl Reams and the Partnership.  [#56 at 6-10].  In contrast to Plaintiff's burden of proof with respect to her negligence claim, she must support a claim for exemplary damages with proof "beyond a reasonable doubt" that Earl Reams and the Partnership acted in a willful and wanton manner.  Colo. Rev. Stat. §§ 13-25-127(2), 13-21-102(1)(a).  The statute defines "willful and wanton conduct" to mean "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."  Colo. Rev. Stat. § 13-21-102(1)(b).  The sufficiency of the evidence to justify exemplary damages is a question of law, *Western Fire Truck, Inc. v. Emergency One, Inc.,* 134 P.3d 570, 578 (Colo. App. 2006), and the evidence must be viewed in the light most favorable to the party awarded exemplary damages.  *Coors v. Security Life of Denver Ins. Co.,* 112 P.3d 59, 66 (Colo. 2005); *Eurpac Service Inc. v. Republic Acceptance Corp.,* 37 P.3d 447, 452 (Colo. App. 2000).

Earl Reams and the Partnership do not contend beyond their general argument regarding causation that exemplary damages are inappropriate.  However, a comprehensive review of the record demonstrates insufficient evidence to support finding that these Defendants acted willfully and wantonly.  For instance, Earl Reams testified on behalf of the Partnership that the Partnership never intentionally grazes its cattle alongside the highways.  [#75-2 at 152:11-14].  He testified that "[w]e just go on and continue trying to be a business and trying to keep the cows

off the road, even though they can legally be there…[i]t's a safety issue…[w]e just as soon nobody hit one of our cows and nobody gets hurt." [#75-2 at 155:5-20]. In response to the question of how the Partnership tries to prevent its cows from entering the highways, Earl Reams testified that "we get them as soon as we know about them and put them back down…[w]e try to get them off the highway…[w]e call CDOT, let them know if there's a fence down or if there's a bad place they need to check…[w]e repair our fences." [#75-2 at 156:6-15]. Earl Reams testified that, "[i]f it gets terrible to where we can't hold them, we start feeding them whether they are out of feed or not…[b]ut even that doesn't hardly stop them," he explained, "because once they get out in the State right-of-way, the feed is so much better along the side of the road…[s]o it's a real problem…we'd like to see that fenced." [#72-5 at 156:16-24]. He testified that Partnership personnel would check on cattle grazing in Parcel 079 "possibly every day," and at least twice a week, [#69-4 at 36:22-37:15], and that was true for the week in December 2015 preceding the accident. [*Id.* at 106:4-107:5]. Finally, he represented that between 2010 and the accident, there had been only one other incident when a cow belonging to the Partnership had been involved in a vehicular accident. [#75-2 at 162:17-25]. Indeed, Mr. White testified that he did not "know that [the Reams would] intentionally" drive their cattle along the highways. [#69-3 at 37:1-14].

I find that the record contains insufficient facts to support willful and wanton conduct, and simple negligence cannot support an award of exemplary damages. *Blood v. Qwest Services Corp.*, 224 P.3d 301, (Colo. App. 2009) (citation omitted). Accordingly, the Reams Defendants' Motion is **GRANTED** as to this claim.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

1. CDOT's Motion for Summary Judgment [#66] is **DENIED**;

2. The Reams Defendants' Motion for Summary Judgment [#69] is **GRANTED IN PART and DENIED IN PART**;

3. The Motion is **GRANTED** as to John Reams and the claim for exemplary damages;

4. The Motion is **DENIED** as to all other requested relief; and

5. The trial in this matter will commence on June 4, 2018 at the Wayne Aspinall Courthouse, 400 Rood Avenue, Grand Junction, Colorado 81501. A separate Trial Preparation Order will issue.


DATED: January 3, 2018                    BY THE COURT:


                                          s/Nina Y. Wang_____
                                          United States Magistrate Judge